# 23-0367-cv

## United States Court of Appeals
### *for the*
### Second Circuit

---

BRAD PACKER, derivatively on behalf of 1-800-Flowers.com, Inc.,

*Plaintiff-Appellant,*

– v. –

RAGING CAPITAL MANAGEMENT, LLC, RAGING CAPITAL MASTER FUND, LTD., WILLIAM C. MARTIN,

*Defendants-Appellees,*

1-800-FLOWERS.COM, INC.,

*Defendant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

THOMAS J. FLEMING
DANIEL M. STONE
OLSHAN FROME WOLOSKY LLP
*Attorneys for Defendants-Appellees*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel certifies that the Defendants-Appellees Raging Capital Management, LLC and Raging Capital Master Fund, Ltd. do not have any parent corporation, and there is no publicly held corporation that owns 10% or more of their stock.

# Table of Contents

INTRODUCTION ................................................................................1

STATEMENT OF ISSUES .................................................................3

STATEMENT OF THE CASE.............................................................4

    I.    The Limited Facts Relevant To This Appeal ........................4

        A.    Proceedings on Remand..........................................4

        B.    The District Court's Well-Reasoned Opinion Finds Packer Lacks Standing ...............................................5

    II.    The Legal Principles Relevant to This Appeal ...................8

        A.    Section 16(b) as Applied to Ten-Percent Beneficial Owners .................................................8

        B.    Article III Standing .................................................12

        C.    *TransUnion v. Ramirez* .........................................14

        D.    *Donoghue v. Bulldog Investors*..............................18

LEGAL STANDARD ON APPEAL.....................................................19

SUMMARY OF THE ARGUMENT ...................................................20

ARGUMENT .....................................................................................20

    THE COURT SHOULD AFFIRM THE DISTRICT COURT'S STANDING DETERMINATION................................................20

        A.    The District Court Faithfully Applied *TransUnion* ..................20

        B.    The District Court Correctly Rejected Packer's Injury Theories........................................................26

             1.    Contrary to Packer's Contentions, Standing Cannot Be Conferred by Statute ................................26

2.    Packer's Claim That Standing Is Conferred Solely
      by an Alleged Statutory Fiduciary Relationship
      Created by Section 16(b) Is Contrary to
      *TransUnion* ....................................................................28

3.    Packer's Claim of Alleged Reputational Harm Is
      Insufficient....................................................................33

4.    Packer Fails to Offer Any Relevant Post-
      *TransUnion* Support ........................................................34

C.    Amicus Offers No Basis for Exempting Section 16(b)
      from *TransUnion*.....................................................................37

1.    Amicus Ignores the Difference Between *De
      Minimis* Injury and No Injury .........................................37

2.    Applying *TransUnion* to Section 16(b) Would
      Neither Eliminate Nor Undermine the Statute ...............39

3.    The District Court's Standing Ruling Is Consistent
      with Section 16(b) Policy as Expressed in
      Regulations and Case Law .............................................44

CONCLUSION ........................................................................49

Table of Authorities

CASES

*Am. Standard, Inc. v. Crane Co.*,
510 F.2d 1043 (2d Cir. 1974) ....................................................................12, 48

*Anderson Grp., LLC v. City of Saratoga Springs*,
805 F.3d 34 (2d Cir. 2015) ....................................................................20

*Avalon Holdings Corp. v. Gentile*,
No. 18cv7291 (DLC), 2023 WL 4744072 (S.D.N.Y. July 25, 2023) ...............36

*Blau v. Lamb*,
363 F.2d 507 (2d Cir. 1966) ....................................................................49

*Blau v. Mission Corp.*,
212 F.2d 77 (2d Cir. 1954) ....................................................................47

*Bohnak v. Marsh & McLennan Cos.*,
79 F.4th 276 (2d Cir. 2023) ....................................................................25, 26

*Brophy v. Cities Serv. Co.*,
70 A.2d 5 (Del. Ch. 1949) ....................................................................19, 31, 41

*C.R.A. Realty Corp. v. Crotty*,
878 F.2d 562 (2d Cir. 1989) ....................................................................49

*City of Providence v. Bats Glob. Mkts., Inc.*,
No. 14-CV-2811 (JMF), 2022 WL 902402 (S.D.N.Y. Mar. 28,
2022) ....................................................................14

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*,
62 F.4th 748 (2d Cir. 2023) ....................................................................20

*Cruper-Weinmann v. Paris Baguette Am., Inc.*,
235 F. Supp. 3d 570 (S.D.N.Y. 2017) ....................................................................35

*Diamond v. Oreamuno*,
248 N.E.2d 910 (N.Y. 1969) ....................................................................19, 41

*Dickson v. Direct Energy, LP*,
　69 F.4th 338 (6th Cir. 2023) ...................................................37, 38, 39

*Donoghue v. Bulldog Investors General Partnership*,
　696 F.3d 170 (2d Cir. 2012) ...........................................................*passim*

*Dottenheim v. Murchison*,
　227 F.2d 737 (5th Cir. 1955) ...............................................................47

*Egghead.Com, Inc. v. Brookhaven Cap. Mgmt. Co.*,
　340 F.3d 79 (2d Cir. 2003) ..................................................................11

*Elk Grove Unified Sch. Dist. v. Newdow*,
　542 U.S. 1 (2004) ...............................................................................13

*Feder v. Martin Marietta Corp.*,
　406 F.2d 260 (2d Cir. 1969) ................................................................45

*Gadelhak v. AT&T Services, Inc.*,
　950 F.3d 458 (7th Cir. 2020) ...............................................37, 38, 39

*Gollust v. Mendell*,
　501 U.S. 115 (1991) .......................................................................46, 47

*Harty v. West Point Realty, Inc.*,
　28 F.4th 435 (2d Cir. 2022) .........................................................*passim*

*In re Trib. Co. Fraudulent Conv. Litig.*,
　10 F.4th 147 (2d Cir. 2021) ................................................................30

*Kendall v. Emps. Ret. Plan of Avon Prods.*,
　561 F.3d 112 (2d Cir. 2009) ...............................................................33

*Kern Cnty. Land Co. v. Occidental Petroleum Corp.*,
　411 U.S. 582 (1973) ..................................................................9, 48, 49

*Klein ex rel. Qlik Techs., Inc. v. Cadian Cap. Mgmt., LP*,
　No. 15 Civ. 8140 (ER), 2017 WL 4129639 (S.D.N.Y. Sept. 15,
　2017) ..................................................................................................34

Table of Authorities
(continued)

*Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*,
    906 F.3d 215 (2d Cir. 2018) ...............................................................34

*Laufer v. Ganesha Hosp. LLC*,
    No. 21-995, 2022 WL 2444747 (2d Cir. July 5, 2022) ....................22, 30, 39, 40

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014).............................................................................13

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...............................................................13, 14, 20

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,
    997 F.3d 436 (2d Cir. 2021) ...............................................................1

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,
    19 F.4th 58 (2d Cir. 2021) ..........................................................*passim*

*Osofsky v. J. Ray McDermott & Co.*,
    725 F.2d 1057 (2d Cir. 1984) ............................................................31

*Packer ex rel. 1-800-Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*,
    --- F.Supp.3d --- (JMW), 2023 WL 2484442 (E.D.N.Y. Mar. 13,
    2023) ...................................................................................................5

*Packer v. Raging Cap. Mgmt., LLC*,
    981 F.3d 148 (2d Cir. 2020) ............................................5, 11, 12, 44

*Raines v. Byrd*,
    521 U.S. 811 (1997).............................................................................13

*Revive Investing LLC v. Armistice Cap. Master Fund, Ltd.*,
    No. 20-CV-02849-CMA-SKC, 2023 WL 5333768 (D. Colo. Aug.
    18, 2023) ......................................................................................36, 37

*Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C.*,
    No. 05 Civ. 10466(RPP), 2006 WL 2129331 (S.D.N.Y. July 31,
    2006) ..................................................................................................46

*Rubenstein v. Int'l Value Advisers, LLC*,
    959 F.3d 541 (2d Cir. 2020) ......................................................12, 42

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)...............................................................1, 15, 39

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .........................................................................13

*Steel Partners II, L.P. v. Bell Indus., Inc.*,
    315 F.3d 120 (2d Cir. 2002) ...............................................12, 48, 49

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014).......................................................................13

*Taveras v. UBS AG*,
    612 F. App'x 27 (2d Cir. 2015) ....................................................33

*Thole v. U. S. Bank N.A.*,
    140 S. Ct. 1615 (2020).........................................................33, 34, 40

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)..............................................................*passim*

*Trichell v. Midland Credit Mgmt., Inc.*,
    964 F. 3d 990 (11th Cir. 2020) ......................................................18

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016) ..........................................................33

*Valley Forge Christian Coll. v. Ams. United for Separation of Church
    & State, Inc.*,
    454 U.S. 464 (1982)......................................................................40

STATUTES

Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, et seq.

    Section 16(a), 15 U.S.C. § 78p(a)......................................8, 9, 35, 47

Section 16(b), 15 U.S.C. § 78p(b) ...............................................*passim*

Section 16(c), 15 U.S.C. § 78p(c) ...............................................9, 10

29 U.S.C. § 104.................................................................................33

29 U.S.C. § 1009...............................................................................33

29 U.S.C. § 1132(a)(2).......................................................................33

Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. .......................*passim*

Americans with Disabilities Act, 42 U.S.C. § 12101 .......................30, 39

Employee Retirement Income Security Act, 29 U.S.C. ch. 18.........32, 33, 34

### RULES AND REGULATIONS

17 C.F.R. § 240.16a-1 .....................................................................10, 11, 44

17 C.F.R. § 240.16a-1(a) ................................................................10, 46

17 C.F.R. § 240.16a-1(a)(1)............................................................5, 42, 45

17 C.F.R. § 240.16a-1(a)(2)............................................................11, 12, 42, 43

53 Fed. Reg. 49997 (Dec. 13, 1988) ..............................................10

54 Fed. Reg. 35667 (Aug. 29, 1989)...............................................10, 43

56 Fed. Reg. 7242 (Feb. 21, 1991) .................................................10

63 Fed. Reg. 2854 (Jan. 16, 1998) ..................................................11

N.Y. R.P.L. § 275.............................................................................25

### OTHER AUTHORITIES

Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting
    Guide (5th ed. 2019) ...............................................................9, 11, 42

Erwin Chemerinsky, *What's Standing After* Transunion LLC v.
Ramirez, 96 N.Y.U. L. Rev. Online 269 (2021)...................................................28

Kenneth L. Yourd, *Trading in Securities By Directors, Officers and
Stockholders: Section 16 of the Securities Exchange Act*, 38 Mich.
L. Rev. 133 (1939) ..............................................................................................29

12B Fletcher Cyclopedia of the Law of Corporations § 5811 (rev. ed.
2023) ...................................................................................................................30

Restatement (First) of Trusts § 205 (1935)...............................................................32

Restatement (First) of Trusts § 206 (1935)...............................................................32

Restatement (First) of Agency § 404 (1933) .......................................................31, 32

## INTRODUCTION

This appeal addresses the application of *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), to claims under Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), against a ten-percent beneficial owner of a class of equity securities. In contrast to corporate insiders, such as officers and directors, a ten-percent beneficial owner is not, without more, a fiduciary and may not possess, or have access to, confidential corporate information. As a result, trading by a ten-percent beneficial owner may not cause injury or loss to an issuer. That is what the district court found here in dismissing for lack of standing.

In *Maddox v. Bank of New York Mellon Trust Co., N.A.*, 19 F.4th 58 (2d Cir. 2021) (*Maddox II*), the Court recognized that *TransUnion* had transformed principles of constitutional standing for claims arising from an alleged statutory violation. The Court thus overturned its original determination that Mr. and Mrs. Maddox had met the standing requirements established by *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). In *Maddox I*, the Court had ruled that the statutory violation asserted by the Maddoxes sufficed for standing since the statute in question conferred "substantive" rights. *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 997 F.3d 436 (2d Cir. 2021) (*Maddox I*). Applying *TransUnion*, the Court in *Maddox II* took a second step, analyzing whether the individual plaintiffs had suffered a concrete injury beyond the alleged statutory violation. *Maddox II* distilled

*TransUnion* into five essential words: "no concrete harm; no standing." 19 F.4th at 62.

Applying *TransUnion* and *Maddox II*, the district court here analyzed whether Appellant had suffered concrete injury as a result of the alleged violation of Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b). Since Appellant offered no evidence of injury apart from the alleged statutory violation, the district court dismissed for lack of standing. Appellees offered unrebutted evidence that they owned ten percent of a junior class of voting securities, which represented 1% of the total voting power of the common shares, and therefore could not possibly be fiduciaries and further, they had no access to the issuer's confidential information. The district court determined that this Court's holding and analysis in *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170 (2d Cir. 2012), could not be reconciled with *TransUnion* and *Maddox II*. The *Bulldog* Court ruled that a violation of Section 16(b), without more, was sufficient to satisfy standing, reasoning that Section 16(b) was analogous to common law principles of fiduciary duty. The *Bulldog* Court did not undertake the additional inquiry required by *TransUnion* and *Maddox II*, to ascertain whether plaintiff had in fact suffered concrete injury.

Contrary to the claims made by Appellant and Amicus, the district court did not rule that plaintiffs could never have standing under Section 16(b). We are

confident that other courts may find injury on other records. The district court did not preclude differing determinations in other cases, any more than *Maddox II* prevented other parties besides the Maddoxes from seeking redress for an untimely mortgage discharge. The district court held only that the issuer, for whom Appellant served as a representative, had not suffered injury where a shareholder with nominal voting power and no access to non-public information earned a profit on trades within six months.

We respectfully submit that the district court opinion should be affirmed.

## STATEMENT OF ISSUES

1.    Has the standing analysis applied in *Bulldog* to claims under Section 16(b) of the 1934 Act been overruled by *TransUnion* and *Maddox II*?

The district court properly answered in the affirmative.

2.    Has Appellant suffered concrete injury within the meaning of *TransUnion* and *Maddox II* where plaintiff claims a statutory violation of Section 16(b) without any other injury and defendants (i) beneficially owned 10% of a junior class of equity securities with nominal voting power and (ii) did not have confidential information from the issuer?

The district court properly answered in the negative, recognizing that Packer's failure to allege any injury and Appellees' inability to influence Board

affairs precluded any claim of a fiduciary relationship, and their lack of confidential information precluded any claim of loss.

## STATEMENT OF THE CASE

### I. The Limited Facts Relevant To This Appeal

#### A. Proceedings on Remand

Appellant Brad Packer ("Packer") is a shareholder of 1-800-Flowers.com ("Flowers"). A20, ¶ 1. He is a representative of Flowers under 15 U.S.C. § 78p(b). The issue of standing on this appeal therefore concerns whether Packer or Flowers has suffered concrete injury.

Appellees Raging Capital Management, LLC, Raging Capital Master Fund, Ltd., and William C. Martin (collectively "Raging Capital") are alleged beneficial owners of more than 10% of a class of voting securities of Flowers, who earned a profit through the purchase and sale of Flowers' Class A common stock within six months. A129. No claim is made that Raging Capital had access to, or traded on, confidential information from Flowers. Raging Capital held Class A common stock, with junior voting rights. *See* A39. Their shares represented approximately 1% of the voting power at any meeting of Flowers shareholders. A129. Raging Capital thus had no ability to exercise control over Flowers or obtain representation on its Board. A39.

On October 15, 2015, Packer filed a Complaint on behalf of Flowers alleging that Raging Capital traded in violation of Section 16(b). A20-25. At the

close of discovery, the district court awarded Packer summary judgment. On November 23, 2020, this Court vacated the award and remanded to allow further factual development regarding whether Raging Capital Master Fund Ltd. was a beneficial owner of Flowers shares. *Packer v. Raging Cap. Mgmt., LLC*, 981 F.3d 148 (2d Cir. 2020) (*Packer I*). The Court recognized that Raging Capital Management LLC and William C. Martin were exempt from beneficial ownership under 17 C.F.R. § 240.16a-1(a)(1)(v) & (vii). *Id.* at 152-53.

After further discovery on remand, Raging Capital moved for summary judgment on several grounds, including lack of standing in light of *TransUnion v. Ramirez*. A128.

B. <u>The District Court's Well-Reasoned Opinion Finds Packer Lacks Standing</u>

In its March 13, 2023 opinion, the district court found that Packer had failed to prove that he or Flowers were injured and thus dismissed for lack of standing after summary judgment briefing. *Packer ex rel. 1-800-Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, --- F.Supp.3d ---, 15-CV-05933 (JMW), 2023 WL 2484442, at *8 (E.D.N.Y. Mar. 13, 2023); A126, A130. Because *TransUnion* requires that "the plaintiff has suffered concrete harm" and Packer failed to offer any "actual injury allegations"—either in "the Complaint", "the opposition papers" or at "oral argument"—the district court found that "Packer ha[d] not made" a

showing of concrete harm flowing from the violation of Section 16(b) "beyond the alleged statutory violation." A140-41, 146.

The district court's opinion rejected Packer's argument that *TransUnion* had no effect on the *Bulldog* analysis. A141. The district court observed that the "judicial landscape on standing following *TransUnion* ha[d] markedly changed." A132. The clear import of *TransUnion*, the district court explained, was that "even though Congress possesses the power to 'elevate' pre-existing harms to 'actionable legal status,' it lacks the power to 'simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is.'" A134 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021)).

The district court highlighted that there is "not a more apt example of *TransUnion*'s impact than what can be found in the Second Circuit's consideration and reconsideration of the *Maddox* case." A135. While the Second Circuit had first found standing based on the statute's similarity to traditional remedies, on rehearing, the Court withdrew its original opinion and recognized that "the harm the statute protects is of 'little (or no) import' in the analysis of concrete harm, it is the harm to the plaintiff that matters." A135-36 (citing *Maddox II*, 19 F.4th 58, 64 n.2). The district court noted, "[t]he *Maddox* duo provide a unique before and after snapshot of the Second Circuit's position with respect to the standing analysis in

the wake of *TransUnion*. A violation of the statute alone there was initially found sufficient to support standing under then-existing precedent. Following *TransUnion*, not so." A136-37.

In light of *Maddox II*, as well as *Harty v. West Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022), the district court ruled that this Court would reconsider *Bulldog* if and when given the opportunity. A132-39. As the district court explained, the *Bulldog* opinion focuses "on the speculative harm that may or [may] not be caused in any individual case from insider trading -- which is the harm Section 16(b) protects against -- that speculative risk cannot in the wake of *TransUnion* automatically support Article III standing in a suit for damages." A138. The district court held, "*Bulldog*'s grant of standing once a violation of Section 16(b) is alleged, without a showing of concrete harm beyond that violation, must yield to the principles announced in *TransUnion*." A140.

The district court was careful to confine its opinion to the facts presented:

> To be clear, that is not to suggest that a plaintiff could never show concrete harm flowing from a violation of Section 16(b) to support standing, and nothing in this decision should be construed as such. The Court only finds that Packer has not made that showing here beyond the alleged statutory violation.

A146.

In seeking dismissal, Appellees stressed the unusual facts regarding Packer's Section 16(b) claim. Appellees were alleged ten-percent beneficial owners of a

class of equity securities that carried nominal voting rights. A49. While labeled a statutory insider under Section 16(b), they had no conceivable influence on corporate affairs, much less owed a fiduciary duty to Flowers or its shareholders. A39. Nor did they have any access to confidential information. *Id.* Before the district court, Packer claimed an alleged injury to Flowers' reputation, but Appellees' trades in Flowers shares were not reported under 15 U.S.C. § 78p(a) based on the exemptions reviewed by this Court in *Packer I* and thus no allegations were made that Flowers' reputation had actually been impacted. A113 at 23:12-21.

On March 14, 2023, Packer filed a notice of appeal. A149. On June 22, 2023, Packer filed his opening brief in this appeal ("Packer Br."). On June 29, 2023, the Securities and Exchange Commission filed an amicus brief in support of Packer's appeal ("Amicus Br.").

## II.    **The Legal Principles Relevant to This Appeal**

While the facts are fairly limited, the relevant legal principles require greater attention.

### A.    Section 16(b) as Applied to Ten-Percent Beneficial Owners

Through the 1934 Act, Congress sought to address "insiders' trading in their companies' stock on the basis of material nonpublic information." Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide 1 (5th ed. 2019). The 1934 Act thus included Section 16, which seeks to "prevent insiders from making

unfair use of confidential corporate information to profit from trading in the corporation's securities." *Id.* at 1; *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 608 (1973) (Douglas, J., dissenting) (congressional investigations "revealed widespread use of confidential information by corporate insiders to gain an unfair advantage in trading their corporations' securities"). Indeed, Section 16(b) states that it exists "[f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b).

The statute applies to three classes of "insiders," directors, officers, and ten-percent beneficial owners of a class of equity securities. Section 16 seeks to curtail the improper use of confidential information in three ways: First, Section 16(a) requires statutory insiders to file reports detailing their transactions in an issuer's securities. 15 U.S.C. § 78p(a). Second, Section 16(b) provides that any profit realized by a statutory insider based on purchases and sales within six months "shall inure to and be recoverable by the Issuer." *Id.* § 78p(b). Third, Section 16(c) prohibits statutory insiders from engaging in short sales of an issuer's securities. *Id.* § 78p(c).

While Amicus suggests that Section 16(b) embodies a legislative intent to capture all short swing trades by all statutory insiders, Amicus Br. at 6-7; 10-14, it fails to mention that the SEC has recognized that the application of Section 16 to

ten-percent beneficial owners has proven problematic. For this reason, the SEC

long ago adopted Rule 16a-1(a), 17 C.F.R. § 240.16a-1(a), which exempts a broad

range of financial institutions and persons from the statute's reporting and profit

disgorgement, provided their trading is in the ordinary course and without an intent

to control the issuer.[1] The exempt institutions include banks, insurance companies,

---

[1] In 1988, the SEC proposed the "first comprehensive review of the regulatory scheme under section 16 since the adoption of the Exchange Act." *Ownership Reports and Trading by Officers, Directors and Principal Stockholders*, Exchange Act Release No. 34-26333, 53 Fed. Reg. 49997, 49998 (Dec. 13, 1988). The initial draft of the regulations aligned Section 16 with the beneficial ownership definitions in Section 13(d), without exception. *Id.* at 50021-22. In response to comments from "institutions engaged in holding securities for their clients in the ordinary course", the SEC modified the proposed regulations the following year to exempt "institutions . . . eligible to file a Schedule 13G." *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Release No. 34-27148, 54 Fed. Reg. 35667, 35670 (Aug. 29, 1989). The SEC observed "the ordinary course of business and passive investment intent conditions should minimize the potential for the institutions to use the aggregated holdings to exert control and gain access to inside information." *Id.*

The final rules were adopted in 1991, including the core of current Rule 16a-1. *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242 (Feb. 21, 1991). The SEC explained that the new regulations were intended to "enhance consistency with the statutory purposes of section 16." *Id.* at 7243. The new Rule 16a-1 established exemptions for eight specified entities, provided additional criteria were met. The exempted institutions continued to have reporting requirements under Section 13(d). In 1998, the SEC expanded the exemptions to include more entities. *Amendments to Beneficial Ownership Reporting Requirements*, Exchange Act Release No. 34-39538, 63 Fed. Reg. 2854, 2857-58 (Jan. 16, 1998). Rule 16a-1 represents an implicit determination that Section 16(b) should not apply to many ten percent beneficial owners, notwithstanding the language in the statute, for the simple reason that short swing trading by the exempted institutions is unlikely to harm the issuer's interests.

registered investment advisers, employee benefit plans and their principals. *Id.* The exemption for investment advisors is discussed at length in *Packer I*. 981 F.3d 148, 152-57 (2d Cir. 2020); *see also* Romeo & Dye, *supra*, at 132-41. "[I]mplicit in these exemptions is 'an equitable consideration: that it would be unfair to place Section 16(b)'s strict liability for disgorgement of short-term profits on [such] investors who may possess no inside knowledge or purpose to engage in the management or to influence control of the issuer.'" *Egghead.Com, Inc. v. Brookhaven Cap. Mgmt. Co.*, 340 F.3d 79, 84 (2d Cir. 2003) (citation omitted). These exemptions demonstrate that the SEC itself has recognized that the application of Section 16 to many ten-percent beneficial owners is both impractical and unwise in the modern era.

A further limitation on Section 16(b)'s statutory scheme appears in Rule 16a-1(a)(2), commonly known as the pecuniary interest exemption. Under this exemption, an investment advisor who engages in short-swing trading that would otherwise be subject to disgorgement, need not make any payment unless he or she has the requisite "pecuniary interest" in the profit. If, however, the profits are part of an overall compensation structure involving a larger portfolio of securities, the advisor may be exempt. 17 C.F.R. § 240.16a-1(a)(2)(C). So too may be the

advisor's customers. *Rubenstein v. Int'l Value Advisers, LLC*, 959 F.3d 541, 546-47 (2d Cir. 2020).

Courts too have at times exercised restraint in applying Section 16(b) to ten-percent beneficial owners. As this Court recognized in *Packer I*, Section 16(b) is a "strong medicine for the ill Congress sought to address" and thus the "strict liability remedy should be employed cautiously to avoid unfair application." *Packer I*, 981 F.3d at 154. Courts have also looked to the statute's stated purpose as guidance to limit its application. *See, e.g.*, *Am. Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1054 (2d Cir. 1974) ("[I]n merger situations the policy objectives of Congress in the enactment of Section 16(b) should be considered . . . 'whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short swing profits based upon access to inside information.'"); *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 127 (2d Cir. 2002) (dividend need not be disgorged "under either a literal reading of Section 16(b) or the policies that underlie the rule," where short swing seller "had neither access to nor an opportunity to abuse material non-public information").

B.    Article III Standing

This case centers on the requirement in Article III of Constitution that federal courts only hear "cases" and "controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). A fundamental component of this requirement is that every plaintiff

must have standing to assert his or her claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Thus, before a claim may proceed in federal court, the complaint must meet a "set of requirements that together make up the irreducible constitutional minimum of standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (internal quotations omitted). "The plaintiff must [1] have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is [2] fairly traceable to the challenged action of the defendant and [3] likely to be redressed by a favorable judicial decision." *Id.* While each of these elements is required to "enforce[] the Constitution's case-or-controversy requirement," *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004), the injury-in-fact requirement is "[f]irst and foremost," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998), because it "helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotations omitted).

Where, as here, standing is challenged at summary judgment, the standing inquiry becomes more demanding to match the procedural posture of the case. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Most relevant for present purposes, '[i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' sufficient to support standing." *City of Providence v. Bats*

*Glob. Mkts., Inc.*, No. 14-CV-2811 (JMF), 2022 WL 902402, at *15 (S.D.N.Y. Mar. 28, 2022) (citing *Lujan*, 504 U.S. at 561).

C.    *TransUnion v. Ramirez*

Recent Supreme Court decisions have refined the "injury-in-fact" requirement for a claim arising from an alleged statutory violation, clarifying that such an injury must be "concrete" and bear a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American Courts." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200, 2213 (2021). Specifically, where a claim is brought for violation of a state or federal statute, it must be accompanied by allegations—and later proved—that the plaintiff has suffered an actual injury such as physical harm, monetary harm, or intangible harm, that is closely related to a harm previously recognized. *Id.* at 2200.

The result in *TransUnion* is instructive. There, the Supreme Court considered a class of plaintiffs where each had experienced false credit reports in violation of the Fair Credit Reporting Act. *Id.* at 2209-10. The Court held that only those plaintiffs whose false credit reports had been disseminated had standing, but those whose reports had never been shared did not. *Id.* Thus, while the statutory violation and cause of action were the same, the *harm* was not. *Id.* at 2210. The essential element was not whether plaintiffs could point to some theoretical harm

akin to a "traditionally recognized" claim, but rather was whether *each* Plaintiff had *suffered* that harm. *Id.* at 2209-10.

In *TransUnion*, the Supreme Court rejected "the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Id.* at 2205 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Court held that although "Congress may 'elevate' harms that 'exist' in the real world before Congress recognized them to actionable legal status, it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* Thus, after *TransUnion*, a legal right to sue conferred by statute is not actionable unless plaintiff also presents plausible allegations of traditional, concrete injury-in-fact.

*TransUnion* is clear: "For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* The Court explained, "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 2208. In other words, post-*TransUnion*, the standing inquiry is a two-step analysis: first, is the harm protected against "concrete," which can be

analyzed by reference to "harms traditionally recognized as providing a basis for lawsuits in American courts"; and, second, did any the plaintiff actually suffer that harm. *Id.* at 2204, 2209-10.

The *TransUnion* Court's review of the class claim encapsulates the two-step analysis. The *TransUnion* Court reviewed claims asserted under the Fair Credit Reporting Act, 15 U.S.C. § 1681, which provides a plaintiff with specified damages upon a statutory violation by a credit reporting agency. Just like Section 16 of the 1934 Act, the Fair Credit Reporting Act authorizes private parties to seek damages for violations of its prohibitions. 15 U.S.C. § 1681n(a). The case came before the Court after judgment was entered in favor of plaintiffs based on a jury verdict finding that the credit reporting agency had violated the Fair Credit Reporting Act. *TransUnion*, 141 S. Ct. at 2202. The violation arose from the agency's placement of information in the credit reports of each class member, stating that the person was a "'potential match' to a name on the OFAC list." *Id.* at 2201-02. The OFAC list is maintained by the Treasury Department to monitor "terrorists, drug traffickers, or other serious criminals." *Id.* at 2201.

To determine the issue of standing, the Supreme Court divided the class of plaintiffs for whom false information had been included in their credit file into two subgroups. For one group, the false information had been disseminated to outside parties. *Id.* at 2201. The Court found that these plaintiffs suffered "concrete

injuries" in the form of reputational harm, which the Court found to be among the injuries "traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 2204, 2206. For the other subgroup, however, the misinformation was never disseminated. *Id.* at 2200. The Court ruled that these plaintiffs did not suffer any "concrete injury." *Id.* at 2200-02. The second group of plaintiffs, the Court ruled, were "not seeking to remedy any harm to [themselves] but instead [were] merely seeking to ensure . . . compliance with regulatory law." *Id.* at 2206 (internal quotations omitted). The *TransUnion* Court further ruled that the type of injury sufficient to confer standing under Article III must be one that traditionally would provide a basis for a lawsuit, such as "physical, monetary, or cognizable intangible harm." *Id.* No such harm could arise if the false information were corrected before its disclosure. *Id.* at 2213-14.

The Supreme Court rejected the argument that a statutory grant to sue conferred standing. The Court wrote, "we cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so." *Id.* at 2205 (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F. 3d 990, 999 n.2 (11th Cir. 2020)). The Court elaborated, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III . . . ." *Id.* The Court set up a clear distinction between "(i) a plaintiff's

statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* Although an "injury at law" may exist solely based on the existence of a federal statute, only a plaintiff that is "*concretely harmed* by a defendant's statutory violation may sue [a] private defendant over that violation in federal court." *Id.* Thus, after *TransUnion*, there can be no doubt that a "bare procedural violation[] [of a statute], divorced from any concrete harm" is not actionable. *Id.* at 2213.

D. <u>*Donoghue v. Bulldog Investors*</u>

The Second Circuit last addressed the question of standing under Section 16 for claims against a ten-percent beneficial owner in *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170, 175-79 (2d Cir. 2012). There, a shareholder of a publicly traded issuer sued an investment fund, Bulldog Investors, that had made a profit buying and selling shares within a six-month period. *Id.* at 172-73.

Finding that the issuer had Article III standing, the Court explained that "where, as here, a plaintiff's claim of injury in fact depends on legal rights conferred by statute, it is the particular statute and the rights it conveys that guide the standing determination." *Id.* at 178. The *Bulldog* holding relies upon the proposition that Congress can draft "statutes creating legal rights, the invasion of which creates standing, even though *no injury* would exist without the statute." *Id.*

at 175 (emphasis added). Ten-percent beneficial owners, the Court reasoned, were akin to fiduciaries, who breached a statutory "fiduciary" duty not to trade during a certain period when they engaged in short-swing trading. *Id.* at 177-78. The Court found that it was sufficient for a Section 16 plaintiff's "interest" in the case to "consist of obtaining compensation for, or preventing, the violation of a legally protected [statutory] right." *Id.* at 178.

The *Bulldog* Court made no claim that Bulldog Investors was an actual fiduciary or that it had received non-public information from the issuer. Nor did it find any actual injury or harm to the issuer, as might occur when a corporate officer or director earns a profit based on confidential information. *See Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949); *Diamond v. Oreamuno*, 248 N.E.2d 910 (N.Y. 1969).

## LEGAL STANDARD ON APPEAL

The Second Circuit "review[s] legal questions relating to standing *de novo* and factual findings for clear error." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 45 (2d Cir. 2015).

"The party invoking federal jurisdiction bears the burden of establishing" standing, and must do so "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "In response to a summary judgment motion [therefore] the plaintiff can no

longer rest on [] 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (citation omitted).

## SUMMARY OF THE ARGUMENT

The holding in *Bulldog* rests on the premise that standing under Section 16(b) for a claim against a ten-percent beneficial owner is derived solely from the breach of a legal right conferred by Congress, without further analysis of whether the breach caused any concrete harm in that specific case.

Post-*TransUnion*, and as further explained below, *Bulldog*'s mechanical statutory standing analysis comprises only half of the picture. In addition to considering whether a statutory harm resembles a traditional harm, the Court must ensure that the plaintiff has actually been harmed. As cogently explained by the district court, Packer has failed to allege that Flowers was harmed in any way by Raging Capital's trading. A140-41. The opinion of the district court must therefore be affirmed.

## ARGUMENT

### THE COURT SHOULD AFFIRM
### THE DISTRICT COURT'S STANDING DETERMINATION

A.    The District Court Faithfully Applied *TransUnion*

The district court's standing ruling faithfully applies *TransUnion* to Packer's Section 16(b) claim, recognizing that *Bulldog* cannot be squared with the Supreme

Court's holding and reasoning. *Bulldog* relied on the premise that pleading a violation of a statue, by itself, could suffice to confer standing. *TransUnion* made clear that standing required an analysis of the individual plaintiff's circumstances, such that some plaintiffs might have standing to redress a statutory violation, while others might not. That was the precise outcome of *TransUnion*.

The district court applied *TransUnion*'s mandate that courts implement a two-step analysis to ensure each plaintiff has constitutional standing by analyzing both whether a common law analog exists *and* whether Packer or Flowers had suffered a concrete harm. *See* A134-35; A146. The district court recognized that for a plaintiff's injury to be constitutionally sufficient, "the injury must be 'de facto,' which means it must 'actually exist' and must be 'real' rather than 'abstract.'" A133. And, while those injuries may be intangible, the injury must bear "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American Courts." A134.

*TransUnion* is clear, however, that the standing inquiry requires more than associating a statutory violation with a traditionally recognized harm. While Congress may "'elevate' pre-existing harms to 'actionable legal status,' it lacks the power to 'simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is.'" *Id.* As this Court recognized in *Maddox II*, "*TransUnion* established that in suits for

damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm: 'No concrete harm; no standing.'" 19 F.4th 58, 62, 64 (2d Cir. 2021) (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021)); *accord Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 440-45 (2d Cir. 2022) (rejecting claims of statutory, informational, or emotional injury where those claims were not supported by allegations of actual harm); *Laufer v. Ganesha Hosp. LLC*, No. 21-995, 2022 WL 2444747, at *2 (2d Cir. July 5, 2022) (summary order) (same).

Once the initial step of *TransUnion* is met with a determination that a traditional analog to the statutory claim exists, the court must proceed to determine whether plaintiff has alleged that he or she has suffered actual harm. The *TransUnion* Court held that "Congress's views may be 'instructive'" but "rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue.'" *TransUnion*, 141 S. Ct. at 2204-05. As *TransUnion* noted, were it otherwise, "Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law." *Id.* at 2206.

In *TransUnion*, the Court considered whether each plaintiff had suffered injuries akin to defamation, not just whether the claim under the Fair Credit

Reporting Act ("FCRA") was analogous to a defamation claim. *See id.* at 2207-13. While each class member had prevailed at trial on a FCRA claim, the Court held that some class members had standing and others did not. *Id.* Thus the *TransUnion* two-step analysis commands *both* evaluation of whether the claimed injury is similar to a traditionally recognized injury and whether that claimed injury has actually occurred, *i.e.*, is "concrete."

The district court carefully reviewed the *Maddox* dyad—noting the significance of the Circuit's "*withdr[awal of]* its prior opinion in light of *TransUnion*"—and the Circuit's instruction that "the harm the statute protects is of 'little (or no) import' in the analysis of concrete harm, it is the harm to the plaintiff that matters." A136. As the district court summarized:

> The *Maddox* duo provide a unique before and after snapshot of the Second Circuit's position with respect to the standing analysis in the wake of *TransUnion*. A violation of the statute alone there was initially found sufficient to support standing under then-existing precedent. Following *TransUnion*, not so. Concrete harm to the plaintiff -- now the required showing -- was missing.

A136-37.

In the instant matter, Packer contended that he need not prove actual injury and therefore did not claim one beyond a violation of Section 16(b). The District Court properly found that Packer therefore had failed to meet the second prong of this analysis. *See* A140-41. Contrary to the arguments advanced by Packer and

Amicus, the district court did not "eviscerate" Section 16(b). The district court limited its ruling to the case presented, finding that Flowers had not suffered any injury due to the Raging Capital trades. A146. The district court recognized that some Section 16(b) plaintiffs *might* suffer concrete injury—a fact conceded by Raging Capital at oral argument below. A94-95.

The second step of the analysis makes clear that some litigants may have standing to pursue statutory claims while others will not. *TransUnion* made this point self-evident by allowing some class members to recover while dismissing others for lack of standing. So too in *Maddox II*, where the Court identified several concrete harms that might arise from the late filing of a mortgage in violation of N.Y. R.P.L. § 275, but noted that none of these harms were suffered by the Maddoxes, who had sold their property a month before paying off their mortgage. 19 F.4th 58, 65 (2d Cir. 2021).

The Court in *Maddox II* considered the legion of other alleged injuries that the Maddoxes claimed and found each wanting. For example, while the bank's failure to properly record the mortgage satisfaction ran the risk of harming their credit, the Maddoxes failed to allege that that risk had materialized for them. *Id.* As the Court explained, "[t]he misleading record may have been public and available to all; but, so far as is known, it was read by no one." *Id.* Finally, though the Maddoxes alleged they suffered "great stress, mental anguish" and "anxiety," the

Court held that these bare allegations did not contain sufficient facts to plausibly allege an actual injury after *TransUnion*. *Id.* at 66. *Maddox II*'s thorough consideration of each of these alleged harms demonstrates the proper implementation of the second step of the *TransUnion* analysis.

The Second Circuit recently applied this two-step analysis to find Article III concreteness in *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276 (2d Cir. 2023), a determination that underscores the necessary two-step analysis. There, the Court considered whether a plaintiff had a concrete injury to pursue a claim for dissemination of personal identifying information where "an unauthorized actor" hacked into the defendants' databases to access the plaintiff's "name and . . . Social Security or other federal tax id number." *Bohnak*, 79 F.4th at 276. The Court found that (a) the hack and resulting disclosure of plaintiffs' sensitive information was analogous to the common law claim of disclosure of private facts, *and* (b) that the plaintiff had alleged that her private information had been disseminated to the hackers, leading her to incur additional harms to protect herself. *Id.* Thus, the plaintiff there was "similar to that of the 1,853 class members who had standing in *TransUnion* based on the publication of misleading information to third parties without regard to whether the third parties used the information to cause additional harm." *Id.* Here, by contrast, no actual harm has befallen anyone, much less Packer or Flowers, and so the second prong of the analysis fails.

B.    The District Court Correctly Rejected Packer's Injury Theories

Packer first argues that *Bulldog*'s holding is undisturbed by *TransUnion* and *Maddox II*. His alternative argument is that Raging Capital is deemed a fiduciary by virtue of Section 16(b) and any breach of a fiduciary duty gives rise to a concrete injury sufficient to establish standing. Last, Packer cites an alleged "reputational injury" suffered by Flowers as the basis for standing. We address each in turn.

1.    Contrary to Packer's Contentions, Standing Cannot Be Conferred by Statute

Packer's central argument is that an alleged violation of Section 16(b), without more, always establishes constitutional standing: "In *Bulldog*, the Second Circuit analyzed the common law roots of Section 16(b) and concluded that Section 16(b) meets the constitutional standing requirements[.]" Packer Br. at 27. In other words, the statute, rather than any individual plaintiff, is the focus of his analysis. Packer thus argues that, for standing purposes under Section 16(b), a plaintiff need not allege any actual harm or injury, beyond an alleged statutory violation. *Id.* at 25-29.

Packer argues in essence that *TransUnion* has no effect on *Bulldog*. *Id.*; *see also* A117, A141 ("I don't think *TransUnion* makes a particle of change to this particular case."). Yet *Bulldog* held that standing under Section 16(b) requires no showing beyond a statutory violation, reasoning that "Congress's legislative

authority to broaden the injuries that can support constitutional standing is beyond dispute." *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 179 (2d Cir. 2012). *TransUnion* rejected this concept, requiring the plaintiff to have also suffered a concrete injury in addition to the statutory violation. *TransUnion* is unambiguous: Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021); *see* Erwin Chemerinsky, *What's Standing After* Transunion LLC v. Ramirez, 96 N.Y.U. L. Rev. Online 269, 285-86 (2021) (noting that *Bulldog* found standing for violations of Section 16(b) "even though no injury would exist without the statute" and thus was inconsistent with *TransUnion*).

The district court rejected this argument and ruled that *TransUnion*'s holding was diametrically opposed to *Bulldog*'s holding:

> At bottom, the notion in *Bulldog* that a violation of Section 16(b) alone sufficiently confers Article III standing upon the issuing corporation or derivative shareholder without more, cannot co-exist with *TransUnion's* pronouncement that a statutory violation and a cause of action alone are insufficient to support Article III standing without a showing of concrete harm to the plaintiff. In that respect, *Bulldog* cannot be squared with *TransUnion* and *TransUnion* controls.

A146. The district court's succinct analysis properly aligns with *TransUnion* and *Maddox*.

2. <u>Packer's Claim That Standing Is Conferred Solely by an Alleged Statutory Fiduciary Relationship Created by Section 16(b) Is Contrary to *TransUnion*</u>

Packer next argues that Congress has legislated a fiduciary relationship through Section 16(b), transforming every ten-percent beneficial owner into a corporate fiduciary, even one like Raging Capital that held a nominal interest and had no non-public corporate information. In Packer's words, "*Bulldog* unequivocally held that through Section 16(b) Congress created a fiduciary duty upon statutory insiders and granted the corporation a legal right to expect them to refrain from any short-swing trading." A138. From this premise, Packer asks the Court to conclude that a breach of a this statutory duty, without any financial loss or other harm, suffices as "concrete injury" under *TransUnion* and *Maddox II*. Packer Br. at 28.

Packer's contention runs afoul of a first principle articulated by *TransUnion*: Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 141 S. Ct. at 2205. Under Packer's analysis, Congress could label any shareholder a fiduciary and require disgorgement. *TransUnion* rejected such a limitless legislative power to confer standing. *Id.* at 2206. Thus, while the legislative history of Section 16 discusses the fiduciary duties of directors and officers, even contemporary observers of the Exchange Act understood that

Section 16 sought to impose "a new standard of conduct *far beyond* that required by prior statutory or case law." Kenneth L. Yourd, *Trading in Securities By Directors, Officers and Stockholders: Section 16 of the Securities Exchange Act*, 38 Mich. L. Rev. 133, 134 (1939) (emphasis added). This congressional expansion of statutory duties is the precise concern of *TransUnion*. *See TransUnion*, 141 S. Ct. at 2205.

Furthermore, courts are not beholden to congressional labelling when analyzing whether the requirements of Article III have been met. In *Harty v. West Point Realty, Inc.*, 28 F.4th 435 (2d Cir. 2022), the Court emphasized that merely labeling a claim in a manner consistent with recognized causes of action would not suffice, absent concrete injury. The *Harty* Court rejected the argument that the alleged flaws in the website made plaintiff a victim of "discrimination" entitled to redress under the Americans with Disabilities Act. *Id.* at 444. The Court explained, "Even if the ADA labeled all violations of that act and its implementing regulations as discrimination . . . *TransUnion* makes clear that a statutory violation alone, however labeled by Congress, is not sufficient for Article III standing." *Id.* at 444 (citing *TransUnion*, 141 S. Ct. at 2205); *accord Laufer v. Ganesha Hosp. LLC*, No. 21-995, 2022 WL 2444747, at *2 (2d Cir. July 5, 2022) (summary order) ("'[I]nformational harm,' without any downstream effects" did not "suffice[] for Article III injury purposes.").

As the holder of one percent of the voting shares of Flowers, Raging Capital in fact owed no fiduciary duty to Flowers or its shareholders under Delaware law. It is settled Delaware law that stockholders who are not controlling shareholders do not owe fiduciary duties by virtue of their equity ownership. *See* 12B Fletcher Cyclopedia of the Law of Corporations § 5811 (rev. ed. 2023) ("Generally, a shareholder who owns less than fifty percent of a corporation's outstanding stock does not, without more, become a controlling shareholder of that corporation with a fiduciary status . . . ."); *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 163 (2d Cir. 2021); *Osofsky v. J. Ray McDermott & Co.*, 725 F.2d 1057, 1060 (2d Cir. 1984). Nor was Raging Capital alleged to have possessed confidential, non-public information obtained from Flowers, subjecting it to potential liability under *Brophy v. Cities Service Co.* and its progeny. 70 A.2d 5 (Del. Ch. 1949) (holding corporate director/officers who trade on confidential information may be compelled to disgorge profits).

Even accepting Packer's fiction of a fiduciary relationship would not confer standing. Packer's reliance on a non-injurious breach of fiduciary duty ignores that while a breach of fiduciary duty claim does not require an *economic* loss, it still requires a showing of some actual *breach of loyalty or trust*, such as through the use of trust property. *See, e.g.*, Restatement (First) of Agency § 404 (1933) (emphasis added) ("An agent who, in violation of duty to his principal, uses for his

own purposes or those of a third person *assets of the principal's business* is subject to liability to the principal for the value of the use."). Section 16(b), by contrast, applies to persons whose short-swing profits may not involve any interest or property of the issuer. The trades covered by Section 16(b) thus do not, without more, approximate the harm in a breach of fiduciary duty case. A plaintiff may well plead and establish self-dealing or abuse of trust in a Section 16(b) claim against true insiders, such as directors, officers and ten-percent beneficial owners who are involved in corporate affairs. But without those facts, there can be no analogy to a breach of fiduciary duty or trust.

Packer's additional authorities regarding fiduciary duty theory also fall short. Packer Br. at 15. For example, he cites to § 404 of the Restatement (First) of Agency, which states that "An agent who, in violation of duty to his principal, uses for his own purposes or those of a third person *assets of the principal's business* is subject to liability to the principal for the value of the use." Restatement (First) of Agency § 404 (1933) (emphasis added). This common law analog does require a showing of the actual use of the principal's business.

Packer's reliance on the Restatement (First) of Trusts §§ 205, 206 is similarly unhelpful to his position. The Restatement provides that a breach of trust occurs only where the trust property has been used. Restatement (First) of Trusts §§ 205, 206 (1935). In any breach of fiduciary duty or breach of trust claim, the

plaintiff must allege an actual *breach* of the fiduciary duty. Packer does not allege such a breach.

Packer's contention that the mere invocation of a breach of fiduciary duty creates statutory standing also runs counter to the established law in this circuit that an ERISA participant does not have standing to bring a fiduciary duty claim unless he or she can show individual injury, even when the claim is entitled "breach of fiduciary duty" and the participant is statutorily authorized to bring suit for such breach. *See Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112 (2d Cir. 2009) (applying 29 U.S.C. §§ 104, 1009, 1132(a)(2)); *see Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020) (rejecting the argument that statutory authorization under § 1132(a)(2) confers Article III standing). This Court has repeatedly held that a plaintiff must still allege more than the breach of that statutorily imposed duty to pass constitutional muster. *See, e.g.*, *Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015); *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 569 (2d Cir. 2016).

*Thole v. U. S. Bank N.A* is instructive. The plaintiffs there argued that they had standing by "analogizing to trust law" arguing that "a plan fiduciary's breach of a trust-law duty of prudence or duty of loyalty itself harms ERISA defined-benefit plan participants, even if the participants themselves have not suffered (and will not suffer) any monetary losses." *Thole*, 140 S. Ct. at 1619. The Supreme

Court rejected this argument, noting that "plan participants possess no equitable or property interest" in the defined-benefits plan and thus had not been harmed as a trust beneficiary might have been. *Id.* at 1620.

Here, the only property that was used by Raging Capital was its own market analysis. Neither Packer nor Flowers had any equitable or property interest in Raging Capital's trades or its trading strategy. The Court's conclusion in *Thole* is a fitting rejoinder to Packer: "Courts sometimes make standing law more complicated than it needs to be. There is no ERISA exception to Article III." *Id.* at 1622. The district court followed *Thole* as well as *TransUnion* in finding that there is no Section 16 exception to Article III either.

### 3. Packer's Claim of Alleged Reputational Harm Is Insufficient

Packer also argues, as he did below, that a violation of Section 16(b) necessarily includes a reputational harm. Packer Br. at 28. In support of this contention, Packer cites to *Bulldog*'s recognition that "a corporate issuer, after all, has an 'interest in maintaining a reputation of integrity, an image of probity,' for its § 16(b) insiders 'and in insuring the continued public acceptance and marketability of its stock.'" *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 177-78 (2d Cir. 2012).

Yet *TransUnion* and *Maddox II* are clear that a plaintiff cannot rely on theoretical harms such as that advanced by Packer regarding Flowers' reputation.

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021); *see also Maddox II*, 19 F.4th 58, 65 (2d Cir. 2021) ("True, the Maddoxes may have suffered a nebulous risk of future harm during the period of delayed recordation . . . but that risk, which was not alleged to have materialized, cannot . . . form the basis of Article III standing."). While a Section 16(b) violation *could* result in reputational injury, Packer offered no evidence that such an injury occurred here. A140-41; *Maddox II*, 19 F.4th at 65.

Packer's reputational injury claim is especially dubious. The Raging Capital trades were not reported under Section 16(a), as Raging Capital relied on exemptions reviewed in *Packer I*. Packer theorized the existence of trades within six months from Raging Capital's regular Schedule 13G and Form 13-F filings. A23. Packer offered no evidence that Flowers, or any other person, knew or cared about the Raging Capital trades that gave rise to an alleged short-swing profit. *See Maddox II*, 19 F.4th at 65 ("The misleading record may have been public and available to all; but, so far as is known, it was read by no one.").

4.  Packer Fails to Offer Any Relevant Post-*TransUnion* Support

Packer cites numerous pre-*TransUnion* cases to support his argument that *TransUnion* has no effect on *Bulldog*. *See* Packer Br. at 24-25 (citing *Klein ex rel. Qlik Techs., Inc. v. Cadian Cap. Mgmt., LP*, No. 15 Civ. 8140 (ER), 2017 WL 4129639 (S.D.N.Y. Sept. 15, 2017); *Klein ex rel. Qlik Techs., Inc. v. Qlik Techs.,*

*Inc.*, 906 F.3d 215, 220 (2d Cir. 2018); *Cruper-Weinmann v. Paris Baguette Am., Inc.*, 235 F. Supp. 3d 570 (S.D.N.Y. 2017)). The district court found that none of these cases assisted its analysis because "each of these decisions pre-date *TransUnion*." A139. The district court properly approached this precedent with skepticism, observing these "cases applied a standing test derived from *Spokeo* -- a test that has been since clarified by *TransUnion*." A142 n.13.

Subsequent to Packer filing his brief, two district courts denied motions to dismiss Section 16(b) claims for lack of standing. *Avalon Holdings Corp. v. Gentile*, No. 18cv7291 (DLC), 2023 WL 4744072, at *6 (S.D.N.Y. July 25, 2023); *Revive Investing LLC v. Armistice Cap. Master Fund, Ltd.*, No. 20-CV-02849-CMA-SKC, 2023 WL 5333768, at *7 (D. Colo. Aug. 18, 2023). In anticipation of Packer's Reply Brief, we address both rulings.

In *Avalon Holdings Corp. v. Gentile*, the court reviewed a Section 16(b) claim by an issuer—not a representative shareholder—and held that *TransUnion* did not undermine *Bulldog*. *Avalon*, 2023 WL 4744072, at *6 ("*Bulldog* . . . is entirely compatible with *Transunion*."). In this respect, the *Avalon* Court erred. The *Avalon* court, however, noted that plaintiff Avalon had alleged more than a statutory violation. Avalon alleged "dramatic fluctuations in stock prices caused by the defendants' trading", which theoretically could support a claim of harm to the marketability of Avalon's securities, as described in *Bulldog*. *Id.*; *Donoghue v.*

*Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 178 (2d Cir. 2012). While the question of whether such price fluctuations are a sufficient injury for constitutional purposes is not before the Court, it further distinguishes *Avalon* from Packer's case. A140-41.

In *Revive Investing LLC v. Armistice Capital Master Fund, Ltd.*, a district court in Colorado relied on *Bulldog* to find that Section 16(b) creates standing for plaintiffs. *Revive*, 2023 WL 5333768, at *7. The *Revive* opinion, like Packer, confuses the requirement that the harm have a root in common law with the requirement that the plaintiff suffer a concrete injury. Thus, the *Revive* court's conclusion that a Section 16(b) plaintiffs necessarily suffer a harm fails to address *TransUnion*'s requirement that the specific plaintiff themselves allege a concrete injury. *See id.* at *8 (finding that "a harm suffered by a Section 16(b) plaintiff is analogous to the common law injury of breach of trust" without analyzing whether the *Revive* plaintiff suffered any harm).

Yet, the record in *Revive* also may supporting standing even after *TransUnion*, though for reasons the Court did not discuss. In *Revive*, the plaintiff claimed that the defendant had "received material nonpublic information" and that the defendant's trading directly harmed the company's ability to raise capital through a stock offering. Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss, ECF No. 111, at 14-15, *Revive Investing LLC v. Armistice Capital Master Fund, Ltd*, 20-cv-

2849 (D. Colo. June 28, 2023). While *Revive* embraces *Bulldog*, the record there might suffice to establish concrete injury beyond the alleged statutory violation.

C.      Amicus Offers No Basis for Exempting Section 16(b) from *TransUnion*

Amicus repackages many of Packer's arguments while offering a new theory for injury and expressing concern about the alleged regulatory impact of a standing limitation on Section 16(b) claims.

1.      Amicus Ignores the Difference Between *De Minimis* Injury and No Injury

Amicus argues that *Dickson v. Direct Energy, LP*, 69 F.4th 338 (6th Cir. 2023) and *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458 (7th Cir. 2020) provide a basis for "concrete injury" in the Section 16(b) context. Amicus Br. at 21. While those decisions may provide a basis for injury in some Section 16(b) cases, they do not alter the outcome here. In both cases, the court considered whether a de minimis number of unwanted messages could qualify as an injury-in-fact. *Dickson*, 69 F.4th at 347-48; *Gadelhak*, 950 F.3d at 462. Both analogized the harm of unwanted text messages to the common law claim of intrusion upon seclusion but noted that such a claim normally requires large numbers of calls. *Dickson*, 69 F.4th at 347-48; *Gadelhak*, 950 F.3d at 462. Yet because the *kind* of injury was similar to the common law claim, the courts ruled that the fact that the degree of injury

differed was unimportant. *Dickson*, 69 F.4th at 345-46; *Gadelhak*, 950 F.3d at 462-63.

Here, by contrast, Amicus does not argue that there has been a de minimis injury. Instead, it concedes that there has been *no injury* at all. Amicus Br. at 25. Put another way, the sole distinction between the Raging Capital trades and those of other shareholders rests on Raging Capital's alleged beneficial ownership of 10% of Flowers Class A Common Stock.

Amicus's attempt to empower plaintiffs to bring suit based on a fictitious injury to a nonexistent fiduciary trust runs counter to the instruction of *Dickson* and *Gadelhak*, which confirmed that for an injury "to qualify as 'concrete'" it "must be 'real' rather than 'abstract'—that is, 'it must actually exist.'" *Gadelhak*, 950 F.3d at 461 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see Dickson*, 69 F.4th at 343 ("A mere procedural violation of a statutory right does not amount to a concrete injury." (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021))).

Thus, *Dickson* and *Gadelhak* are inapplicable to the issue before the Court because they concern a de minimis injury, as opposed to the *absence* of an injury. More applicable are this Court's decisions in *Harty* and *Laufer*, where the Court rejected ADA tester standing where plaintiff sought to use the court as a "freewheeling power to hold defendants accountable for legal infractions" without

any actual alleged injury. *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022) (citing *TransUnion*, 141 S. Ct. at 2205); *Laufer v. Ganesha Hosp. LLC*, No. 21-995, 2022 WL 2444747, at *2 (2d Cir. July 5, 2022) (summary order). In *Dickson* and *Gadelhak*, the plaintiffs were injured, even if they were less injured than would normally support a suit at common law. In *Harty* and *Laufer*, by comparison, the testers had disclaimed any actual injury because they never intended to utilize the allegedly ADA-noncompliant facilities and thus would never be harmed by alleged deficiencies in the website. *Harty*, 28 F.4th at 443; *Laufer*, 2022 WL 2444747, at *2. Here, as in *Harty* and *Laufer*, Packer and Amicus have conceded that he could not allege even a de minimis harm and, as such, *Dickson* and *Gadelhak* are inapplicable.

> 2. Applying *TransUnion* to Section 16(b) Would Neither Eliminate Nor Undermine the Statute

Amicus also argues "the district court's ruling, if affirmed, would eviscerate Section 16(b); few if any plaintiffs, would be able to demonstrate standing." Amicus Br. at 9. This concern is both insufficient and incorrect.

The argument that if Packer does not have standing, no one would have standing "has long [been] rejected" as sufficient to ignore the requirements of Article III. *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1621 (2020) ("[T]he 'assumption that if respondents have no standing to sue, no one would have

standing, is not a reason to find standing.'" (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982))).

The district court, moreover, did not make such a sweeping pronouncement regarding Section 16(b) standing. It followed *TransUnion* and held that on the factual record presented on summary judgment, Packer had not demonstrated concrete injury suffered by Flowers. A146. At oral argument, Raging Capital's counsel conceded that other Section 16(b) plaintiffs would likely have standing, especially for claims against director and officers. A94-95. The possibility that other courts might misconstrue the breadth of the district court's opinion provides no grounds for reversal.

Amicus defends its position on the theory that is impossible to "requir[e] a plaintiff to 'point to' 'actual' harm" in a Section 16(b) case. Amicus Br. at 25. Not so. Directors and officers who trade within six months are true corporate insiders with access to nonpublic information. At common law, corporations would have claims against these insiders to the extent they misused confidential information, which the courts deemed a company asset. *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949); *Diamond v. Oreamuno*, 248 N.E.2d 910 (N.Y. 1969).

Amicus offers no explanation for its contention that the district court's analysis would prevent Section 16(b) claims against true insiders or ten-percent beneficial owners who used inside information. *Cf.* A146 ("To be clear, that is not

to suggest that a plaintiff could never show concrete harm flowing from a violation of Section 16(b) to support standing, and nothing in this decision should be construed as such."). Indeed, the application of Section 16(b) to these insiders may well be analogous to the small number of unwanted messages reviewed in *Dickson* and *Gadelhak*.

Amicus also argues that applying *TransUnion* to Section 16(b) conflicts with congressional intent to broadly capture all those designated as statutory insiders. Amicus Br. at 25-29. Legislative intent, however, is "of little (or no) import" for the question before this Court: whether there has been an injury to a plaintiff. *Maddox II*, 19 F.4th 58, 64 n.2 (2d Cir. 2021).

Amicus's suggestion that Section 16(b) claims are vital to protecting issuers and the securities markets is more than a little ironic. Through its own rulemaking, the SEC already substantially curtailed the sweep of the statute when applied to ten-percent beneficial owners. Amicus has exempted banks, insurance companies, investment companies, registered investment advisers, employee benefit plans, and others from Section 16(b) when their investments are passive. 17 C.F.R. § 240.16a-1(a)(1). These same beneficial owners may also be exempted by Rule 16a-1(a)(2), the "pecuniary interest exemption." 17 C.F.R. § 240.16a-1(a)(2)*; see* Romeo & Dye, *supra*, at 1162-63, 1219-20. Indeed, clients and customers with a financial interest in the shares traded by these financial institutions may receive the benefit

of the short term trading profit without risk of disgorgement. *See Rubenstein v. Int'l Value Advisers, LLC*, 959 F.3d 541, 548-49 (2d Cir. 2020). Even a non-exempt financial institution may earn a short swing profit without any disgorgement under Section 16(b) where its share of the profit falls within the "pecuniary interest" exemption. § 240.16a-1(a)(2).

These exemptions reflect the SEC's desire "to avoid undue interference with the day-to-day business of banks, brokers, dealers, investment advisers and other specified institutional fiduciaries and custodians" and a practical conclusion that "the ordinary course of business and passive investment intent conditions should minimize the potential for the institutions to use the aggregated holdings to exert control and gain access to inside information." *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Release No. 34-27148, 54 Fed. Reg. 35667, 35670 (Aug. 29, 1989). In other words, the SEC has already determined that certain institutions in certain transactions do not deserve the harsh medicine of Section 16(b) because of a decreased risk of the harm Congress intended to protect against. The district court merely extended this principle to a transaction where Packer had failed to present *any* harm at all. A146.

The exemptions crafted by the SEC are no doubt congressionally authorized. But they also underscore that the SEC itself has long recognized that the application of Section 16 to many ten-percent beneficial owners serves no purpose

at all when those owners have no access to corporate information and are not true insiders. There is no principled basis to claim that a trade executed by a registered investment advisor and exempt under Rule 16a-1 is not harmful, while the exact same trade executed by a non-exempt entity with the same passive intent causes injury sufficient for Article III standing.

Packer's claim in this case reflects this incongruity. As this Court recognized in *Packer I*, Raging Capital Management LLC is an exempt financial advisor. *Packer I*, 981 F.3d 148, 152-53 (2d Cir. 2020) ("[It was] undisputed . . . that RCM, as a registered investment advisor, is an entity exempt from beneficial ownership of shares it holds on behalf of a customer . . . and that Martin is a control person with respect to RCM and exempt from beneficial ownership . . . ."). Packer's claim against Raging Capital Master Fund Ltd. rests on the premise that the exempt trades executed by the financial advisor may give rise to liability if Packer can establish that Raging Capital Master Fund Ltd. was a beneficial owner of the shares, a determination that involves no showing of any activity involving any of the evils that Congress sought to circumscribe in Section 16.

Amicus argues that "short-swing profits can have additional downstream consequences" such as "diminishment of the issuer's 'interest in maintaining a reputation of integrity, an image of probity,' and reduced 'public acceptance and marketability of its stock.'" Amicus Br. at 16. Raging Capital does not dispute that

short-swing trading *could* harm an issuer. When it does, the issuer will have standing. Otherwise, the issuer, like any other unharmed plaintiff, has no access to federal court. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 n.3 (2021) ("In our view, unharmed plaintiffs who seek to sue" under a law that creates an obligation owed to individuals is "still doing no more than enforcing general compliance with regulatory law. And under Article III and this Court's precedents, Congress may not authorize plaintiffs who have not suffered concrete harms to sue in federal court simply to enforce general compliance with regulatory law.").

> 3.  The District Court's Standing Ruling Is Consistent with Section 16(b) Policy as Expressed in Regulations and Case Law

Contrary to Amicus's preferred regulatory concerns, *TransUnion*'s standing test is especially appropriate for claims under Section 16(b) and consistent with Section 16(b) jurisprudence. Indeed, the application of *TransUnion* to prevent claims based on a statutory "gotcha" provides fairness and balance to the enforcement of Section 16 against ten-percent beneficial owners, especially those like Defendants who owned only 1% of the total voting power of the company and had no conceivable control or influence.

Through Rule 16a-1(a)(1), the SEC itself has exempted a broad range of financial institutions from the burdens of Section 16's ten-percent beneficial ownership requirements. 17 C.F.R. § 240.16a-1(a)(1). Liability may arise, of course, where a ten-percent beneficial owner uses its position to assert control or to

obtain Board representation. *See Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969) (finding corporate shareholder liable under Section 16 by virtue of its designation of a corporate director); *Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C.*, No. 05 Civ. 10466(RPP), 2006 WL 2129331, at *1 (S.D.N.Y. July 31, 2006) (same), *aff'd*, 522 F.3d 242 (2d Cir. 2008). The requirement that the plaintiff suffer concrete injury merely extends concepts accepted by the SEC in Rule 16a-1(a) to a broader class of ten-percent beneficial owners, while ensuring that federal courts address only actual cases and controversies, not bounty-hunting litigation.

Packer's case, if anything, bears great similarity to the individual claims found wanting in *TransUnion* and *Maddox II*. In *TransUnion*, the class plaintiffs who lacked standing would not have known of their claims but for discovery undertaken by the lead plaintiff. *TransUnion*, 141 S. Ct. at 2212. The Maddoxes professed ongoing injury, but were unaware that a mortgage satisfaction had been filed three months before they brought suit. *Maddox II*, 19 F.4th 58, 66 (2d Cir. 2021). Here, Packer purchased shares of Flowers after the trades in question based on discussions with his attorney. Packer Depo. Tr. at 32:19-33:9, Exhibit 1 to Declaration of Thomas J. Fleming In Support of Defendants' Motion For Summary Judgment, *Packer ex rel. 1-800-Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, No. 2:15-CV-05933-JMW (E.D.N.Y. Sept. 17, 2021), ECF No. 88-1. Packer thus

took advantage of the broad statutory standing acknowledged by *Gollust v. Mendell*, granting "subsequent purchaser[s] of the issuer's securities . . . standing to sue for prior short-swing trading." 501 U.S. 115, 124 (1991) (citing *Dottenheim v. Murchison*, 227 F.2d 737, 738-40 (5th Cir. 1955) (plaintiff shareholder may pursue Section 16(b) claim arising before his share purchase); *Blau v. Mission Corp.*, 212 F.2d 77, 79 (2d Cir. 1954) (same)). Indeed, he invoked attorney-client privilege in refusing to answer a question about his reason for buying Flowers shares. Packer Depo. Tr., *supra*, at 19:6-20:6. The Flowers trades challenged in the complaint were not disclosed in a filing under Section 16(a), but could be deduced as likely to have occurred by comparing Raging Capital's filings under Schedules 13F and 13G. A23. Packer's opportunistic purchasing of a share to bring this suit—and Flowers' decision not to sue—underpins the lack of injury. While the focus of the appeal is limited to whether Flowers has standing, the circumstances regarding Packer's involvement with Flowers highlight the lack of actual harm in this case. It is appropriate therefore that Packer's claim receives the same treatment as those asserted by the non-injured plaintiffs in *TransUnion* and *Maddox II*.

Such a result is in accord with the pragmatic approach to the application of Section 16(b) often adopted by courts. For example, "in merger situations the policy objectives of Congress in the enactment of Section 16(b) should be considered . . . 'whether the transaction may serve as a vehicle for the evil which

Congress sought to prevent—the realization of short swing profits based upon access to inside information.'" *Am. Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1054 (2d Cir. 1974) (citing *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594 (1973)). In fact, "the teaching of Kern County is that for Section 16(b) liability there must be a likelihood of access to inside information 'by reason of its ownership of more than 10% of the outstanding shares' . . . ." *Id.* at 1055. In other words, in the merger context, the Second Circuit already requires a plaintiff to demonstrate that the defendant actually harmed the issuer. *TransUnion* merely expands that inquiry to all Section 16(b) claims.

Likewise, in *Steel Partners II, L.P. v. Bell Industries, Inc.*, the Second Circuit rejected an attempt to require disgorgement of dividends received during the Section 16(b) six month period. 315 F.3d 120 (2d Cir. 2002). In so doing, the Court followed the *Kern County* decision, which "recogniz[ed] the overbreadth of Section 16(b)" and "the prevailing view . . . to apply the statute only when its application would serve its goals." *Id.* at 124 (citing *Kern Cnty.*, 411 U.S. at 595). It noted that "[t]he Second Circuit has applied this principle to the questions of whether a 'purchase and sale' has in fact occurred and whether someone qualifies as an insider." *Id.* at 125 (citations omitted). The Court carefully considered that "Steel Partners had neither access to inside information nor control or influence over Bell's corporate affairs", which "negate any inference that Steel Partners

could have abused inside information or manipulated the [dividend] by virtue of its position as a stockholder of more than ten percent of Bell's stock." *Id.* at 126. Thus, the Court found that Steel Partners was not required to disgorge the dividend "under either a literal reading of Section 16(b) or the policies that underlie the rule." *Id.* at 127; *see also Blau v. Lamb*, 363 F.2d 507, 519 (2d Cir. 1966) ("Congress adopted the sweeping, arbitrary regulatory mechanism embodied in Section 16(b) in order to insure that even the possibility of insider abuse was deterred, but it would seem to follow that in order to avoid 'purposeless harshness' a court should first inquire whether a given transaction could possibly tend to accomplish the practices Section 16(b) was designed to prevent."); *C.R.A. Realty Corp. v. Crotty*, 878 F.2d 562, 565-66 (2d Cir. 1989) (holding that vice-president was not an officer under Section 16(b), despite his officer title, because his position did not offer access to inside information, in accord with SEC guidance).

In sum, the district court opinion is in accord with other Section 16(b) jurisprudence that seeks to ensure that Section 16(b) suits only proceed in those situations "when its application would serve its goals" of preventing the use of inside information for private profit. *Kern Cnty.*, 411 U.S. at 595. That this result is reached through the standing doctrine is of no import.

## **CONCLUSION**

Based on the foregoing, the Raging Capital Defendants-Appellees

respectfully submit that the judgment of the district court should be affirmed.

Dated:  New York, New York
           September 21, 2023

                                   OLSHAN FROME WOLOSKY LLP


                                   By:    /s/ Thomas J. Fleming
                                          Thomas J. Fleming
                                          Daniel M. Stone
                                          *Attorneys for Raging Capital*
                                          *Defendants-Appellees*
                                          1325 Avenue of the Americas
                                          New York, New York 10019
                                          (212) 451-2300

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,577 words, excluding the parts of the brief exempted Federal Rule of Appellate Procedure 32(f) and the rules of this Court. In making this certification, I have relied upon the word count function in Microsoft Word.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally space typeface using Microsoft Word in Times New Roman, font size 14.

By: <u>/s/ Daniel M. Stone</u>